UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICIA NELSON, *next friend of* N.K.,
a minor,

    Plaintiff,

v.

CITY OF BATTLE CREEK, et al.,

    Defendants.
_____/

Case No. 1:16-cv-456

HON. JANET T. NEFF

## OPINION

    Plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983 against Defendant City of Battle Creek and police officer Esteban Rivera, after N.K., a minor, was shot in the right shoulder by Officer Rivera outside a convenience store on November 16, 2013 when Rivera responded to a 911 dispatch of a male carrying a gun. The City has since been dismissed. The sole remaining claim is Plaintiff's § 1983 claim of excessive force.

    The matter is before the Court on Defendant Rivera's Motion for Summary Judgment on the ground of qualified immunity (ECF No. 60). Plaintiff has filed a Response (ECF No. 61), and Defendant has filed a Reply (ECF No. 62). Defendant has also filed a notice of intent to rely on new authority (ECF No. 73), to which Plaintiff has filed an objection (ECF No. 74).[1] After full

---

[1] Plaintiff's "objection" merely states her argument on the merits of the authority cited by Defendant, i.e., that the case is distinguishable from the instant case. The Court has considered the parties' opposing arguments. Plaintiff's "objection" per se to Defendant's notice is therefore denied.

consideration, the Court concludes that oral argument is unnecessary to resolve the Motion. *See* W.D. Mich. LCivR 7.2(d). Defendant's Motion is denied.

## I. Stipulated Facts

The parties stipulate to the following material facts:

1. On November 16, 2013, NK and three of his friends (SC, SW, and JW) were playing "Cops and Robbers" in NK's neighborhood.

2. On the day and times in question, NK had an Airsoft BB pistol, which he had colored all black with a Sharpie marker. The Airsoft gun had also been altered so that it no longer had an orange tip.

3. At some point, the girls (SC, SW, and JW) went to the Drive-Thru Party Store so they could use a bathroom.

4. The [dispatch] log indicates that at 11:58 am Officer Rivera was dispatched and en route to the call at the Party Store.

\* \* \*

6. Officer Rivera did not activate his lights or siren.

7. NK was still crouched down by a Newport cigarette sign at the end of the store when he first saw Officer Rivera's car. With the Airsoft gun placed in his waistband, NK walked from the sign toward the front door of the store.

8. As Rivera turned right onto the street of the Party Store, Officer Rivera could see NK and he radioed Dispatch to say, "OK, I got him. He's walking towards the store now."

9. As Officer Rivera turned into the Party Store parking lot, he could see the girls exit the Party Store and saw NK walk toward them.

10. Officer Rivera pulled in and parked his patrol car at an angle and exited his car.

11. At some point, Officer Rivera fired his gun one time, hitting NK in the right shoulder.

(Joint Statement of Material Facts (JSMF), ECF No. 72).

## II. Legal Standards

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess*, 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sierra Brokerage Servs.*, 712 F.3d at 327 (quoting *Anderson,* 477 U.S. at 251-52).

## III. Analysis

To state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege (1) the violation of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of state law. *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). Claims that law enforcement officers have used excessive force are analyzed under the Fourth Amendment's reasonableness standard. *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008). "'[T]he question is whether the officers' actions are 'objectively reasonable' in

light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Griffith v. Coburn*, 473 F.3d 650, 656 (6th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citation omitted)).

The affirmative defense of qualified immunity applies to excessive force claims under § 1983. "Police enjoy qualified immunity unless (1) the facts alleged show that the police violated a constitutional right; and (2) the right was clearly established." *Jones,* 521 F.3d at 559. Under this test, "qualified immunity is proper unless 'it would be clear to a reasonable officer' that his use of excessive force 'was unlawful in the situation he confronted.'" *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "The burden is on the plaintiff to demonstrate that the officer is not entitled to qualified immunity." *Coble v. City of White House*, 634 F.3d 865, 870-71 (6th Cir. 2011).

Defendant argues that Plaintiff has not met her burden to present a genuine challenge to Officer Rivera's qualified immunity from suit. Defendant contends that the facts concerning his shooting a teen who disobeyed police orders and instead seemingly drew a real weapon did not violate clearly established law because "[c]ourts nationwide recognize that when a person draws or brandishes a real-looking BB gun to an officer and disobeys police orders, an officer who shoots that person does *not* violate clearly established law because officers must diffuse reasonably perceived threats of serious harm, and BB guns (especially Airsoft ones) commonly look real" (ECF No. 60 at PageID.174-175).

Plaintiff does not disagree that whether an officer's conduct is objectively reasonable depends, in part, on whether the suspect poses an immediate threat to the safety of the officers or others. Plaintiff contends, however, that Defendant's deployment of deadly force against N.K. was unreasonable and excessive because case law precedent at the time of the incident clearly

established that "it is unlawful to shoot an unarmed man, who is neither fleeing nor a felon …" (ECF No. 61 at PageID.314).

"Under *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985), the police may not use deadly force against a citizen unless 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902-03 (6th Cir. 1998) (quoting *Garner*, 471 U.S. at 3). As the Supreme Court long ago explained:

> The proper application of Fourth Amendment reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871–72, 104 L. Ed.2d 443 (1989). This is an objective test, to be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *id.*, and making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *id.* at 397, 109 S. Ct. at 1872. Thus, in a civil suit arising from the use of deadly force, the police "[d]efendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have [shot the victim]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986). The central legal question is whether a reasonably well-trained officer in the defendant's position would have known that shooting the victim was unreasonable in the circumstances. *Id.* at 345, 106 S. Ct. at 1098.

*Sova*, 142 F.3d at 903. However, "[w]hen 'the legal question ... is completely dependent upon which view of the facts is accepted by the jury,' the District Court cannot grant a defendant police officer immunity from a deadly force claim." *Id*. (quoting *Brandenburg v. Cureton,* 882 F.2d 211, 215–16 (6th Cir. 1989)).

5

Thus, whether Defendant is entitled to qualified immunity depends first on the facts and circumstances presented, and more specifically, whether the facts critical to the qualified immunity determination are in dispute.

The parties characterize the facts differently.

Defendant states that this lawsuit involves N.K.'s "brandishing of an Airsoft replica of a Smith and Wesson semi-automatic pistol altered to look real, as well as his disobedience of [Defendant's] clear order, 'Let me see your hands!,' when [N.K.] instead reached for the gun" (ECF No. 60 at PageID.191). Defendant cites the following underlying facts: Defendant "responded to a call about a 'man with a gun.' He waited to approach until it seemed as if the situation could quickly grow much more dangerous. He used his car to create a wedge between potential hostages. He twice demanded, 'Let me see your hands! Let me see your hands!' Instead, within mere seconds, [N.K.] admittedly reached for and pulled the gun out of his waistband from under his T-Shirt. [N.K.] had modified the gun to look real. He admittedly was afraid that he would be arrested or shot because he had the real-looking replica. [N.K.'s] mother and a friend both warned him that he was going to get himself hurt brandishing the replica *because* a reasonable person would think it was real at first glance." (*Id.* at PageID.194).

Defendant asserts that when presented with these circumstances, he had only a split-second to make a decision about a person pulling a gun on him in close proximity to three young women (*id.*). Under the Constitution and laws of the United States, that decision is not subject to second-guessing in hindsight. Thus, Defendant did not violate any clearly established law when he reasonably used potentially-deadly force to respond to a serious threat of death or serious bodily injury. "Instead, the cases say just the opposite; namely, that officers in similar situations were immune from suit." (*Id.* at PageID.194-195).

Plaintiff, on the other hand, argues that the facts in this case clearly support that the deployment of deadly force against N.K. was unreasonable and excessive, and the case law precedent holding that it is unlawful to shoot an unarmed man, who is neither fleeing nor a felon, has been clearly established long before the date of this incident, November 16, 2013 (ECF No. 61 at PageID.314). Plaintiff states as supporting facts that "N.K. was not a threat to Defendant or anyone else, did not have a weapon in his hand, and was complying with Defendant's order to show him his hands (which were empty)" (*id.* at PageID.316). Plaintiff cites S.W.'s testimony that N.K. was shot after he had already dropped the gun when he moved his shoulder a little bit as in a shrug (*id.*, citing S.W.'s Dep. at 40, ECF No. 60-5 at PageID.245). Plaintiff contends that contrary to Defendant's argument, the timing of the shooting does not justify Defendant's actions of shooting N.K. given the totality of the circumstances (*id.* at PageID.317).

In the Court's view, the actual underlying, material, facts in this case rest somewhere between Defendant's version and Plaintiff's version, particularly with respect to the shooting.[2] For instance, N.K. was neither "brandishing a gun" nor "unarmed." The record establishes that N.K. was openly displaying the gun before the incident, while playing cops and robbers with the three girls on neighborhood streets, as they walked toward the store. When Defendant arrived on the scene and observed N.K., however, he was not "brandishing" a gun. But neither was N.K. "unarmed" when confronted by Defendant. The radio dispatch, based on a local caller's observations and report, informed Defendant that the man carrying the gun, later determined to be N.K., was at the store. N.K.'s own testimony establishes that he tucked the gun in his pants waistband before Defendant arrived, and when commanded by Defendant to put his hands in the

---

[2] The Court cites its view of the facts only for purposes of this motion, and these facts are not intended as a final resolution of any factual disputes.

air, N.K. first reached into his pants and removed the gun, throwing it to the ground. Plaintiff's assertion that N.K. was "unarmed" is based on the contention that *at the moment he was shot*, N.K. "did not have a gun in his hand" (*see* ECF No. 61 at PageID.315, 316) because he had thrown it to the ground. However, the fact remains that N.K. did have a gun when Defendant confronted him at the store. This case hardly can be aligned with the case law involving an "unarmed" suspect.

Further, Defendant categorizes this case as one in which the suspect did not comply with police orders, i.e., to put out his hands so Defendant could see them. However, Plaintiff characterizes this case as one in which the suspect was complying with police orders: N.K. "was complying with Defendant's order to show him his hands (which were empty)" (ECF No. 61 at PageID.316). Again, whether N.K. complied with police orders lies somewhere between Defendant's version and Plaintiff's version depending on the moment in question.

The record establishes that N.K. did not immediately comply with Defendant's orders. According to N.K.'s testimony, when Defendant said "let me see your hands," N.K. "pulled the gun out and thr[e]w it and then kick[ed] it" (N.K. Dep. at 230, ECF No. 60-3 at PageID.235). When asked why he did that, N.K. stated: "Because I was like so scared because like I had a gun right there in front of me. And like, I don't know. I was scared. I thought I was going to die" (*id.* at 230-231). The record of N.K.'s deposition testimony indicates that that he did not *immediately* comply with Defendant's commands:

> Q. You were worried that he [Defendant] might shoot you because of the gun that you had in your pants?
>
> A. Yes.
>
> Q. You were worried that you might get in trouble in the first place because you had this BB gun, fair?
>
> A. Yes.

8

Q. And why were you afraid that you might die?

A. Because it was a gun – because a gun is pointed at me.

Q. And when you pull the gun out, you said – what did you do?

A. I was like this and that (indicating) and then I kicked it.

Q. So you're motioning with your right hand that you pulled it out of your waistband?

A. Yes.

Q. And sort of tossed it forward and then you kicked it?

A. Yes.

Q. And all of this happens in front of the police car?

A. Yes.

Q. And this happens after he says, let me see your hands?

A. Yes.

Q. Do I understand correctly, you're trying to get rid of the gun because you're scared?

A. Yes.

Q. You don't want to die?

A. Yes.

You don't want to get in trouble?

A. Yeah.

Q. And you're not thinking much about what you're doing, you're just trying to get rid of this thing, right?

A. Yes.

Q. He says, let me see your hands, all right. You've thrown the gun out now, and kicked it. What happens next?

9

> A. I go to put my hands up and then he shoots.
>
> Q. So your hands are going back up sort of halfway or whatever?
>
> A. Yes.
>
> Q. And you get popped in the shoulder?
>
> A. Yes. And then I like go down some, and I think he's yelling like get on the ground. I turned around and run.

(*Id.* at 231-232).

Nevertheless, compliance with an officer's order is only one of the various circumstances that must be taken into account in determining whether a defendant officer's conduct is objectively reasonable under the totality of the circumstances. Here, the parties dispute the actual timing of the shooting with regard to N.K.'s compliance and whether Defendant reasonably perceived N.K. as a threat. Plaintiff maintains that N.K. did not have a gun in his hand at the time he was shot, and he posed no threat.

Defendant responds that the crucial moment was not the moment N.K. was shot, but instead Defendant's "decision/commitment to take the shot; that is, when his brain told his body to pull the trigger in response to a reasonably perceived threat of serious imminent harm" (ECF No. 62 at PageID.541). Defendant states: "For the average real human being, and regardless of training, about ½ to ¾ of a second elapses from when the person commits to take an action until their body actually completes the action, according to settled physiological studies about reaction time" (*id.* at PageID.541-542). Defendant provides a supporting affidavit and other evidence for this contention. Defendant thus contends that most of the facts upon which Plaintiff relies are irrelevant because Defendant did not know anything about them when he committed to take the shot in response to the threat he reasonably perceived N.K. to present.

10

Defendant relies on the dashboard camera video, which Defendant contends, eliminates any material issue about what happened during the shot, when considered in conjunction with N.K.'s testimony. While the video does provide evidence of the overall timing of the incident and the actions of both N.K. and Defendant, it is not conclusive as to the key disputed issues: N.K.'s compliance vis-à-vis the timing of the shooting. The video does not clearly show N.K.'s actions or specifically, what if any, movement he made when Defendant yelled "Let me see your hands." Here, the entire incident occurred very rapidly. Although Defendant is later heard on the video stating that N.K. went for the gun, the video does not show the crucial moment when that apparently occurred.

Here, Plaintiff likely has an uphill battle to prove that Defendant's conduct was objectively unreasonable. "'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, ___ U.S. ___; 134 S. Ct. 3, 5 (2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S. Ct. 2074, 2085 (2011) (citation and internal quotations omitted)); *see also Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). However, there are sufficient factual disputes, viewing the facts in the light most favorable to Plaintiff, to persuade the Court that the issue of qualified immunity is not properly decided by summary judgment.

In *Sova*, the Sixth Circuit reversed the district court's grant of summary judgment based on qualified immunity, finding that qualified immunity turned on disputed issues of fact:

> In the present case, the District Court apparently concluded that the immunity question was not clear-cut because the court allowed the parties to conduct extensive discovery. The discovery depositions, affidavits, exhibits, and other material demonstrate clearly that the two sides do not agree on the facts. The police officers claim Thomas threatened to get a gun and then charged at them through the kitchen door with knives drawn on the porch. The Sovas deny this

version of what happened. They claim Thomas never said anything about a gun and was shot before he ever stepped out of the kitchen doorframe. Our resolution of this case therefore turns upon whether it was proper for the District Court to grant the officers qualified immunity in the face of such a factual dispute.

* * *

[S]ummary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force. When "the legal question ... is completely dependent upon which view of the facts is accepted by the jury," the District Court cannot grant a defendant police officer immunity from a deadly force claim.

*Sova*, 142 F.3d at 902-03. Here, the question of qualified immunity turns upon which version of the facts one accepts, precluding a determination of liability by the Court.

## IV. Conclusion

On the record presented, the Court concludes that genuine issues of material fact exist with respect to Plaintiff's claims, and Defendant's Motion for Summary Judgment is properly denied. An Order will enter consistent with this Opinion.


Dated: February 21, 2018                             /s/ Janet T. Neff
                                                    JANET T. NEFF
                                                    United States District Judge